UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dubow Textile, Inc., | Civil No. 18-2963 (DWF/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Western Specialized, Inc., and Twin Cities Logistics I, Inc. | |
| Defendants. | |

## INTRODUCTION

This case is before the Court on cross-motions for summary judgment filed by Defendant Western Specialized, Inc. ("Western") (Doc. No. 69) and Plaintiff Dubow Textile, Inc. ("Dubow") (Doc. No. 90).[1] For the reasons discussed below, the Court denies both motions.

## BACKGROUND

Dubow is a Minnesota corporation that provides custom embroidery and digital printing services to customers worldwide. (Doc. No. 16 ("Am. Compl.") ¶ 8.) On April 3, 2018, Dubow purchased a pre-owned digital printer (the "Printer") for $100,000. (Am. Compl. ¶¶ 9-10; Doc. No. 79 ("Wills Aff.") ¶ 2, Ex. A ("Printer Invoice").) Dubow hired Total Logistics, Inc. ("Total Logistics"), a transportation broker, to arrange for the shipment of the Printer from Los Angeles to St. Cloud, Minnesota. (Doc. No. 71 ("Smith

---

[1] Dubow also filed a Motion for Leave to File an Untimely Summary Judgment Motion. (Doc. No. 89.) The Court grants the motion.

Aff.") ¶ 3, Ex. D ("Thompson Dep.") at 9-12.)  Total Logistics hired Twin Cities Logistics I, Inc. ("TCL") to arrange transport.  (*Id*. at 13.)  TCL then hired Western to ship the printer.  (Smith Aff. ¶ 3, Ex. E ("Post Dep.") at 8, 15.)[2]

Dubow also hired Hydra Ink, LLC ("Hydra Ink") to prepare the Printer for shipping.  (Smith Aff. ¶ 3, Ex. B ("Hopper Dep.") at 39.)  Hydra Ink had successfully packaged and loaded printers for Dubow before.  (*Id*. at 32-33.)  Keith Thompson, of Total Logistics, spoke with Scott Hopper, of Hydra Ink, several times before shipment.  (Smith Aff. ¶ 3, Ex. D ("Thompson Dep.") at 42.)  They discussed logistics, such as the timing of the pickup and requirements to load the Printer into the trailer.  (*Id*.)  In addition, Thompson understood that Hydra Ink's role included testing the Printer to make sure it was running properly, loading the Printer into the trailer, and securing the Printer for transit.  (*Id*. at 46-47.)

On April 15, 2018, Hopper and Charles Gray, both of Hydra Ink, examined the Printer in Los Angeles before packaging the Printer.  (*Id*. at 54-55; Wills Aff. ¶ 6, Ex. E.)  On April 17, 2018, a truck driver for Western, Kelly Hauser, arrived to pick up the Printer.  (Smith Aff. ¶ 3, Ex. H ("Hauser Dep.") at 10-12.)  Hauser was driving a semi-truck with an attached trailer.  (*Id*.)  Hauser picked up a load of air conditioners in Los Angeles before picking up the Printer.  (*Id*. at 13.)  The air conditioners were in the front

---

[2]   Western submits that TCL possessed Western's Accessory Changes terms and conditions, which specified that "Bills of Lading not indicating value will be valued by Western" and "[v]alue will be assigned 1.50 per pound of the order."  (Smith Aff. ¶ 3, Ex. E at Dep. Ex. 2.)  This document is not signed by TCL or Western and there is no evidence that Dubow was provided, or otherwise knew of, this document.

2

of the trailer. (*Id.*) When she first arrived at the facility to pick up the Printer, Hauser had trouble pulling into the loading area. (Hopper Dep. at 92-93.) Once at the loading dock, Hopper and Gray used a forklift to load the Printer into the trailer. (*Id.*) They loaded the Printer with the back of it entering the trailer first, so that it was "pressed up tight" against the freight on the truck, and the front of the Printer was facing towards the rear of the trailer. (*Id.* at 74.) After the Printer was loaded, Hauser attempted to pull away from the dock to allow Hydra Ink's employees to secure the Printer and take pictures. (*Id.* at 93-94.) However, Hauser forgot that she had set the brakes, so her first attempt to pull away failed. (*Id.*) She then released the brakes and pulled away, and Hopper and Gray finished loading the trailer. (*Id.*)

Dubow asserts that Hopper and Gray pressed the Printer up against the air conditioners and placed inflatable bladders on the sides and the back of the Printer. (*Id.* at 73-74, 94.) Hopper claims that he bolted the Printer to the floor of the trailer. (*Id.* at 94.) Hopper submits that they bolted down the feet of the Printer—as opposed to using a wood block—because they knew the block would crack due to the Printer's weight. (*Id.* at 144-45.)

Before Hauser left with the Printer, Hopper and Gray took photos showing that the Printer was not damaged. (*Id.* at 72; Wills Aff. ¶ 8, Ex. G.) Hauser closed the trailer doors after looking into the trailer and confirming that the Printer was secure inside. (Hauser Dep. at 25-27.) Before Hauser left, Hopper realized that there was not a bill of lading. (Wills Aff. ¶ 9, Ex. H.) Hopper contacted Total Logistics, who then sent the bill of lading via email. (*Id.*) Hopper checked the bill of lading, confirmed the information,

3

signed it, and gave it to Hauser. (Hopper Dep. at 124-25; Hauser Dep. at 71.) The bill of lading identified Hydra Ink as the "SHIPPER" and Dubow as the "CONSIGNEE." (Smith Aff. ¶ 3, Ex. E at Dep. Ex. 4.) Next, Hauser picked up a load of household goods and, while they were being loaded, Hauser again confirmed that the Printer was not damaged. (Hauser Dep. at 38.)

      Hauser then left Los Angeles and drove three days to reach Mankato, Minnesota. (*Id*. at 41.) In Mankato, Hauser separated the trailer from her truck and connected it to that of another driver, Duane Hanson. (Smith Aff. ¶ 3, Ex. I ("Hanson Dep.") at 11-15.) Hanson inspected the truck and exterior of the trailer. (Hanson Dep. at 12-14.) He did not see any issues. (*Id*.) Hanson first delivered the household goods to a stop in Chaska, Minnesota. (*Id*. at 15.) In Chaska, Hanson discovered an air leak on a rubber hose that operates the brake system on the trailer. (*Id*. at 17-18.) Hanson fixed the leak but did not immediately inform Western. (*Id*. at 20-21.) While in Chaska, Hanson did not inspect the Printer. (*Id*. at 23.)

      Hanson then drove the Printer to St. Cloud. (*Id*. at 24.) Hanson does not recall anything remarkable about the trip or any sudden stops. (*Id*.) Dubow employees came out to unload the Printer and discovered that it was severely damaged. (*Id*. at 25-26.) Robert Dubow, the owner of Dubow, examined the damage and called his insurance agent, David Dilley. (Smith Aff. ¶ 3, Ex. A ("Dubow Dep.") at 34-35.) Dilly visited that same day. (Wills Aff. ¶ 11, Ex. J ("Dilley Dep.") at 6.) Dilley testified that the Printer had slid four to five feet forward and damaged some air conditioners. (*Id*. at 7.) He also testified that he was "surprised that there was no tie downs or anything on it," that he saw

4

some holes in the floor of the trailer, and that it looked as though some type of screws had been pulled out of the holes. (*Id*. at 7-8.) They took photographs of the damaged Printer. (Wills Aff. ¶ 12, Ex. K.)

Hopper visited Dubow a few weeks later to look at the damage. (Hopper Dep. at 87-88.) Hopper observed "extreme damage" to the Printer, the most significant being damage to the extruded I-beams. (*Id*. at 42-43, 88.) There was additional damage to the Printer's steel box frame, the arm to which the monitor of the Printer was mounted, the fiberglass frame, and the pallets on the Printer. (*Id.* at 169.) The Printer was considered a total loss. (*Id*. at 42, 106.) Hopper testified that printers like the one at issue here are not easily damaged because they are so heavy (over 4500 pounds), and that the extensive damage to the Printer must have been caused by an extremely heavy object falling "top down" on its front side. (*Id*. at 42-43, 46-47.) In addition, Hopper explained that this level of damage could not have been caused by the Printer moving around inside the trailer or by something hitting the side of the Printer. (*Id*.) According to Hopper, this is because the damage primarily involved components from the top of the Printer down, not the side of the machine. (*Id*. at 106-107, 138.) Hopper further explained that because of the Printer's weight, it would not move around after being secured under normal driving conditions, and even without proper securing, it would not usually move. (*Id*. at 105-06, 192.) Moreover, Hopper stated that even if the Printer was not secure *and* it moved inside the trailer, it would not have caused the damage that the Printer sustained. (*Id*. at 105-106.)

Dubow purchased the Printer for $100,000.  (Dubow Dep. at 93.)  It is rare to find a Printer in good condition for this price.  (*Id*.)  Dubow replaced the Printer for just over $650,000, including installation and shipping.  (Wills Aff. ¶ 13, Ex. L.)  Dubow also claims it took fourteen months to find a suitable replacement, during which time Dubow sustained a net profit loss of $314,212.50.  (Dubow Dep. at 80.)

After learning that the Printer was damaged, Robert Bjerke, Western's owner, began an investigation.  (Wills Aff. ¶ 15, Ex. N ("Bjerke Dep.") at 28.)  The electronic log, which records and contains various information, including speed and braking, shows that Hauser did not make any sudden stops—or "hard brakes"—while transporting the Printer from Los Angeles to St. Cloud.  (Wills Aff. ¶ 16, Ex. O ("Electronic Log"); Bjerke Dep. at 17-20, 28, 32-33.)  Hanson's truck, which is older than Hauser's, only keeps electronic data for so long, and the data was not preserved.  (*Id*. at 28-31.)  Hanson, however, denies any sudden stops on the trip.  (Hanson Dep. at 45.)

Dubow filed its Third Amended Complaint and Demand for Jury on January 24, 2019.  Presently, one claim remains in this case—a Carmack Amendment claim against Western.  Both parties move for summary judgment.  The Court considers the motions below.

## DISCUSSION

### I.     Summary judgment

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996) (citing Fed. R. Civ. P. 56(c)).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**II.     Liability**

The sole remaining claim in this case is one under the Carmack Amendment of 1906 to the Interstate Commerce Act (the "Carmack Amendment").  The Carmack Amendment generally makes interstate carriers liable for damages to property carried in interstate commerce unless the carrier can prove certain defenses.  *See* 49 U.S.C. § 14706; *Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964); *Just Take Action, Inc. v. GST (Americas) Inc.*, Civ. No. 04-3024, 2005 WL 1080597,

at *4 (D. Minn. May 6, 2005).  Under the Carmack Amendment, a plaintiff establishes a prima facie case by showing:  "(1) the goods were undamaged prior to shipment; (2) the goods arrived in a damaged condition; and (3) the action caused plaintiff's damages." *Just Take Action, Inc.*, 2005 WL at *4.  Once a plaintiff establishes a prima facie case, the burden shifts to defendant to demonstrate that the damage was caused by an excepted cause, including the act of the shipper himself.  *See Minneapolis, St. P. & S.S.M.R. Co. v. Metal-Matic, Inc.*, 323 F.2d 903, 905 (8th Cir. 1963).  The carrier's burden is very heavy because "it has peculiarly within its knowledge the facts which may relieve it of liability."  *Cont'l Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 841 (8th Cir. 1988).

There is no dispute that the Printer was undamaged before being shipped by Western.  The Printer's undamaged condition was confirmed before Western's truck driver left Los Angeles with the Printer.  There is also no dispute that the Printer arrived in St. Cloud in a damaged condition.  Further, there is evidence that the damaged condition of the Printer resulted in some amount of damages to Dubow.  Thus, Dubow has established a prima facie case under the Carmack Amendment.

Western argues that it has pointed to evidence in the record that establishes that the sole cause of damage to the Printer was shipper Hydra Ink's failure to secure the Printer.  Western argues that Hydra Ink was exclusively responsible for securing the Printer, Hydra Ink failed to properly secure the Printer, and that this failure caused the damage to the Printer.  In support, Western points to the deposition testimony of Scott Hopper, wherein he states that Hydra Ink was responsible for loading and securing the

Printer and that Hydra Ink did not seek any assistance from Western while doing so. (Hopper Dep. at 38.) In addition, Western points to record evidence that the manner in which the Printer was secured—bolted down and using inflatable bladders—"looks funny," but nonetheless Hydra Ink represented that it was ready for transport. (Hopper Dep. at 38; Hauser Dep. at 21.) Western argues that while Hopper claims that he bolted the Printer to the trailer floor, all other evidence suggests the opposite. For example, Western points out that upon inspection after the damage was discovered, Dubow's insurance agent remembered seeing some empty holes where it appeared that some screws had been pulled out.

Dubow, on the other hand, argues that Western has failed to satisfy its burden of proof. Dubow maintains that there is no evidence that tends to show that the damage was caused by the Printer moving around or that Western's drivers drove without negligence, but rather the evidence shows that the Printer was damaged by something heavy falling on the Printer. Moreover, Dubow submits that Western did not rebut testimony that the Printer was bolted down. Thus, having stated a prima facie case, Dubow argues that it is entitled to summary judgment on its Carmack Amendment claim.

The Court concludes that fact issues remain with respect to liability, and in particular regarding who caused the damage to the Printer. The record contains conflicting evidence that must be weighed and considered by the fact finder. In particular, there is evidence in the record that could lead a reasonable juror to two different conclusions—that Hydra Ink was solely responsible for the damage to the Printer by failing to properly secure the Printer or that it was not solely responsible, in

9

which case Dubow would prevail. Therefore, the Court denies both motions for summary judgment.

## III. Damages

Damages under the Carmack Amendment include damages for delay, lost profits, and all reasonably foreseeable consequential damages. *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 931 (7th Cir. 2003). Dubow argues that is has established recoverable damages in the amount of $980,895.71. This amount reflects the replacement cost for the Printer, Dubow's lost net profit, costs for damage assessment, and shipping costs. Western claims that Dubow's recoverable loss is significantly less. Western argues that Dubow cannot recover the requested $651,300 for the replacement printer that was purchased fourteen months after the Printer was damaged or the claimed $314,212.50 in lost profits. Instead, Western argues that the Court should hold that Dubow's alleged damages are limited to $100,000, the purchase price of the Printer.

The Court finds that a fact issue remains as to the amount of Dubow's damages, and relatedly what the fair market value of the Printer was considering the difficulty in finding a suitable replacement. The Court will leave those decisions for the jury. The Court will also leave for the jury any determination regarding the foreseeability of harm

related to lost profits and the reasonableness of waiting fourteen months before replacing the Printer.[3]

In its motion for partial summary judgment, Western argues that its liability for the Printer's shipment is limited to $1.50 per pound under the Carmack Amendment, for a total of $7,500 ($1.50 x 5,000 lbs). The $1.50 per pound amount is in accordance with the Accessory Changes document given to TCL by Western. Western argues that the dispute over damages centers on whether Western obtained the shipper's agreement as to its choice of liability and whether the shipper was given a reasonable opportunity to choose between two or more levels of liability. Western further argues that the evidence shows that TCL had the opportunity to choose between a limited liability rate of $1.50 per pound and a higher rate, and having not chosen the higher rate, Western's liability is limited.

Dubow argues that there is no evidence that Western gave Dubow a reasonable opportunity to choose between two or more levels of liability or that Western obtained Dubow's agreement as to its choice of liability. Dubow further argues that there is no evidence that anyone associated with Western, TCL, or Total Logistics told Dubow that Western's liability would be limited as stated in the Accessory Changes document, which was not referred to or incorporated into the Contract Carrier Agreement. Dubow also contends that Western cannot rely on a liability limitation agreement between Western

---

[3] The Court will consider relevant motions *in limine* related to the proper measure of damages, which is an issue of law for the Court, not a fact issue for the jury.

11

and TCL, of which Dubow was unaware, to limit Dubow's recovery.  Moreover, Dubow points to evidence casting doubt on whether the Accessory Changes document constitutes an agreement, as there is no indication that TCL accepted the proposed Accessory Changes document for consideration and there is no evidence that the document was signed or dated or that any other relevant agreements reference or incorporate the document.

The Court is not persuaded, on the record before it, that summary judgment is warranted in Western's favor on this point.  Instead, the issue of damages and any limitation on liability will be for the jury.

## CONCLUSION

The Court denies both parties' motions for summary judgment.  Accordingly, this case will proceed to trial.  However, the Court feels that it would be in the best interests of the parties to attempt to settle this dispute.

## ORDER

Based upon the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Dubow's Motion for Leave to File an Untimely Summary Judgment Motion (Doc. No. [89]) is **GRANTED**.

2. Western's Motion for Summary Judgment (Doc. No. [69]) is **DENIED**.

3. Dubow's Motion for Summary Judgment (Doc. No. [90]) is **DENIED**.

Dated:  July 23, 2020                               s/Donovan W. Frank
                                                    DONOVAN W. FRANK
                                                    United States District Judge