UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Dubow Textile, Inc., | Civil No. 18-2963 (DWF/LIB) |
| Plaintiff, | |
| v. | FINDINGS OF FACT<br>CONCLUSIONS OF LAW<br>AND ORDER FOR JUDGMENT |
| Western Specialized, Inc., Total Logistics Inc., and Twin Cities Logistics I, Inc.,[1] | |
| Defendants. | |

Christopher A. Wills, Esq., Derek C. Harvieux, Esq., Kevin F. Gray, Esq., and Troy A. Poetz, Esq., Rajkowski Hansmeier Ltd; Laura Brooks, Esq., Dougherty, Molenda, Solfest, Hills & Bauer P.A., counsel for Plaintiff.

James T. Smith, Esq., Huffman, Usem, Crawford & Greenberg, PA, counsel for Defendant Western Specialized, Inc.

The above-entitled matter came before the Court on a three-day bench trial commencing September 27, 2021. The sole remaining claim in this case is one under the Carmack Amendment of 1906 to the Interstate Commerce Act, 42 U.S.C. § 14706 (the "Carmack Amendment").

Plaintiff Dubow Textiles, Inc. ("Dubow") argues that Defendant Western Specialized, Inc. ("Western") is liable for damages in the amount of $634,987.71 reflecting the replacement cost, lost net profit, costs for damage assessment, and shipping

---

[1] Defendants Total Logistics Corp. and Twin Cities Logistics I, Inc. were dismised from this matter pursuant to stipulations with Plaintiff. (*See* Doc. Nos. 51, 112.)

costs related to a printer (the "Printer") damaged during transport. Western argues that it is not liable to Dubow in any amount because any damage to the Printer was solely caused by an act of the shipper. Alternatively, Western argues that it limited its damages to Dubow to $1.50 per pound of the Printer, or $7,500, pursuant to an agreement with a logistics company that arranged transport.

Based on the parties' arguments, submissions, and the record, the Court now issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## SUMMARY OF DECISION

The Court finds that Western failed to meet its burden to prove at trial that damage to the Printer was caused by a sole act of the shipper. Therefore, the Court finds that Western is liable under the Carmack Amendment. The Court finds that the fair market value of the Printer before it was damaged was $150,000 and that its post-damage value was $0. Dubow is therefore entitled to $150,000 in actual damages. Dubow is also entitled to recover its $14,995 loading fee, its $1,990 shipping fee, and the $3,880.21 it paid in post-damage inspection costs. The Court finds that Dubow is not entitled to lost net profit, as the lost profits were not reasonably foreseeable to Western. Notwithstanding Dubow's damages, the Court finds that Western limited its liability to $7,500 through its agreement with Twin Cities Logistics.

It is undeniably unfortunate that Dubow's Printer was damaged beyond repair and appropriate that Dubow seeks redress. Nonetheless, the Court cannot conclude that Western is liable for all of the damages that Dubow seeks. If all Defendants were still

parties to this lawsuit, the Court would find that Total Logistics Corp. ("Total Logistics") and Twin Cities Logistics, Inc. ("TCL") were negligent, and therefore liable to Dubow. As brokers under 49 U.S.C. § 13902, Total Logistics and TCL had a duty to protect the shipment of the Printer. By failing to inquire about or share the value of the Printer with each other or with Western when arranging shipment of the Printer, Total Logistics and TCL failed to protect it. As set forth below, the Court finds sufficient record evidence to conclude that both brokers knew that indicating an item's value to a carrier was essential to ensuring the item would be properly insured and that failure to do so could limit the carrier's liability for the item. TCL, in particular, knew or should have known that failure to provide the Printer's value would limit Western's liability to $1.50 per pound. While the Court is sympathetic to Dubow's loss, the Court cannot conclude that Western is liable for its total loss when there was no privity between the parties and the intermediaries clearly failed in their responsibilities.

## FINDINGS OF FACT

1. Plaintiff Dubow Textile, Inc. ("Dubow") is a Minnesota corporation that provides custom embroidery and digital printing services to customers worldwide.

2. On or about April 3, 2018, Dubow purchased a pre-owned digital Printer for $100,000. The $100,000 price was below market value due to unique circumstances with its original owner. (Doc. No. 160 ("Trial Trans. Vol. I") at 22-24.) The seller's original asking price for the Printer was $150,000. (*Id.* at 23.) Similar printers were being sold for $100-150,000. (Doc. No. 153-1 at 42.)

3. Dubow's purchase of the Printer was contingent upon a favorable inspection by Dubow's long-time business acquaintance, Scott Hopper ("Hopper"). Hopper inspected the Printer in early 2018 and communicated its good condition to Dubow. At the time of the inspection, Hopper was a principal of Hydra Ink, Inc. ("Hydra Ink).

4. Dubow hired Total Logistics, a transportation broker, to arrange for the shipment of the Printer from Los Angeles to St. Cloud, Minnesota. The Printer measured 128x91x67 inches and weighed 5,000 pounds.

5. Dubow requested that the Printer be the last freight loaded on the trailer, and the first freight unloaded.

6. Total Logistic requested the Printer's dimensions and weight for purposes of providing Dubow with a shipping rate for the Printer's transportation. Total Logistics did not request the Printer's value and Dubow did not provide the value to Total Logistics at any time during their communications regarding the Printer's shipment.

7. Total Logistics had brokered numerous prior shipments for Dubow; however, Total Logistics never discussed the significance of declaring the value of the products being shipped.

8. Total Logistics in turn hired TCL to arrange the Printer's transport. Total Logistics communicated the shipment origin and destination, the Printer's dimensions, and the Printer's weight to TCL. Total Logistics did not communicate the value of the Printer to TCL.

9. TCL hired Defendant Western Specialized Inc. ("Western") to ship the printer.

10. TCL and Western had conducted business together since approximately 2008. At some time prior to the shipment of the Printer, Western provided TCL with a written document titled "Western Specialized Accessory Changes" ("the Accessory Changes Agreement"), which specified that "Bills of Lading not indicating value will be valued by Western" and "[v]alue will be assigned $1.50 per pound of the order." (Trial Ex. 5.) The Accessory Changes Agreement is not signed by TCL or Western and there is no evidence that Dubow was provided, or otherwise knew of this document.

11. TCL communicated the Printer's dimensions and weight to Western and asked for a freight quote to transport the Printer from Los Angeles, California to St. Cloud, Minnesota. TCL did not communicate the Printer's value to Western. (Doc. No. 161 ("Trial Trans. Vol. II") at 315.)

12. Based on the Printer's weight and dimensions, Western quoted TCL a rate of $1,400 to transport the Printer. Based on numerous past dealings and pursuant to the Accessory Changes Document, TCL understood that Western's quote was based on an undeclared value which would limit Western's liability. (*Id.* at 315, 317-318.) TCL then quoted Total Logistics a rate of $1,690, and Total Logistics quoted Dubow a rate of $1,990, which Dubow accepted.

13. Both Total Logistics and TCL knew that the carriers could offer different rates based on liability, that the rates were dictated by the value of the shipment, and that failure to indicate a value could limit the liability to a price per pound, which was

5

consistent with their custom and practice. (Trial Trans. Vol. II at 276-82, 314-15.) TCL understood that a full liability rate for the Printer would have been more than double Western's $1,400 quote. (*Id.* at 328.)

14. Dubow was not aware that it had accepted a limited liability rate.

15. TCL assured Total Logistics and Total Logistics assured Dubow that the Printer would be the last freight loaded onto the trailer and the first freight unloaded.

16. Dubow hired Hydra Ink to prepare the Printer for shipping, which included the Printer's loading and securement for transport. Hopper, and another Hydra employee, Charles Gray ("Gray") flew to California to prepare the Printer for shipment. Dubow paid Hydra Ink $14,995 for its services.

17. Hopper told Dubow that he was experienced in shipping the type of Printer that Dubow had purchased. Hopper represented that it was not necessary to crate the Printer for shipment.

18. Western's truck arrived to pick up the printer on April 17, 2018. Several pallets of air conditioning units were already loaded in the trailer. Hopper and Gray loaded the printer, which was on its wheels, into the trailer before ultimately lowering the Printer's feet to prevent further movement.

19. Hopper claims that he bolted the printer to the floor of the trailer through pilot holes in the feet of the printer using approximately 3-inch-long lag bolts.

20. Hopper and Gray shrink-wrapped the printer and placed inflatable tubes on the sides.

21. After securing the Printer, Hopper informed Western's driver, Kelly Hauser ("Hauser") that the Printer was ready for transport. Hauser looked into the trailer, observed the Printer and the inner tubes, and determined that everything looked secure.

22. Hopper provided Hauser with a bill of lading that identified Hydra Ink as the shipper and Dubow as the consignee. The bill of lading contained language stating that "where the rate is dependent on value, the shippers are required to state in writing the agreed or declared value of the property." (Trial Ex. 3.) The bill of lading did not state a value. (*Id.*) Hopper signed the bill of lading and provided the signed document to Hauser who departed with a copy in her possession.

23. Hauser next went to pick up a third load of freight—several pallets of sewing machines, water urns, and cookers (collectively "Household Goods") before proceeding to Minnesota.

24. Prior to loading the Household Goods in the trailer, Hauser placed a load strap between the Printer and the Household Goods, approximately two feet behind the Printer.

25. No evidence was produced at trial demonstrating that the Household Goods were safely and adequately secured inside the trailer. Hauser did testify that the Household Goods were stacked over six feet high.

26. Hauser drove the load to Western's yard in Mankato, Minnesota.

27. Western driver Duane Hanson ("Hanson") arrived at Western's yard in the morning on April 23, 2018. Western assigned him the transport of the trailer containing the Printer from its yard in Mankato to the various destinations for the Printer, the

7

Household Goods, and the air conditioners. Hanson departed Mankato that evening to first deliver the Household Goods in Chaska, Minnesota.

28. The Chaska consignee unloaded the Household Goods and did not report any damage to Hanson. Hanson proceeded to St. Cloud, Minnesota to deliver the Printer.

29. When the Printer arrived in St. Cloud, Minnesota, it had sustained significant damage. The left corner of the Printer closest to the nose of the trailer was slightly further towards the nose of the trailer than its opposite right corner. The monitor workstation, which had been upright and mounted on the right side of the front of the printer had collapsed toward the back of the Printer and pressed into the internal track components of the Printer. One of the Printer's two sliding pallets had broken from its shipping bracket and had slid backward toward the nose of the trailer. The Printer's back frame was dented in multiple locations where the Printer had come into contact with the pallet holding the air conditioner freight. The shrink wrap attached to the Printer on its backside closest to the air conditioners was severely shredded along with multiple scratches to the upper-right frame of the Printer's backside due to its contact with a pallet holding the air conditioner. Additional denting on the Printer's sides and corners indicated the Printer had come into contact with the walls of the trailer during transit. The inner tubes originally placed on the sides of the Printer were found behind the printer and multiple inner tubes had become deflated.

30. The air conditioners behind the Printer had shifted backward and the air conditioners closest to the Printer had evidence that the Printer had contacted them causing denting to the lower pallet's boxes. The lower wood pallet closest to the right

backside of the Printer was severely damaged where it had protruded past the air conditioners secured to it so that the pallet's wood was broken into pieces and strewn across the trailer floor between the Printer and the air conditioners. The upper wood pallet closest to the right backside of the Printer was also damaged with pieces of wood broken off and several of its nails exposed facing downward. The load strap originally placed on the upper pallet remained in place, although the pallet and its air conditioners had shifted forward slightly toward the nose of the trailer.

31. Dubow accepted the Printer subject to a damage claim and noted the bill of lading accordingly.

32. Dubow did not unbolt the Printer for purposes of removing it from Western's trailer. Dubow's insurance agent testified that he saw some holes in the floor of the trailer, and that it looked as though some type of screws had been pulled out of the holes. The evidence does not reflect that any screws were recovered from the back of the trailer. Over a year after the Printer was delivered, a subsequent inspection of the trailer did not indicate any holes in the trailer's floor. The inspection did not include checking underneath the trailer for signs of bolting.

33. After the Printer was delivered, Dubow paid Hopper $3,880.21 to appraise the condition of the printer.

34. The damage was so extensive that the Printer was non-operational and could not be repaired.

35. Dubow was not able to replace the Printer for more than a year.

## CONCLUSIONS OF LAW

1.Dubow asserted a claim for damages against Western under the Carmack Amendment, 42 U.S.C. § 14706.

2.With respect to the interstate road carriage of the Printer from Los Angeles, California to St. Cloud, Minnesota, Total Logistics, TCL, and Western were all at material times engaged in the business of a carrier and were a receiving, delivering, and/or other carrier within the meaning of the 49 U.S.C. § 14706 and 49 U.S.C. § 13102.

3.Dubow produced evidence sufficient to establish a prima facie case under the Carmack Amendment, as the Printer was in an undamaged condition prior to shipment, arrived in a damaged condition, and resulted in damages to Dubow.  *See* 49 U.S.C. § 14706; *Missouri Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964); *Just Take Action, Inc. v. GST (Americas) Inc.*, Civ. No. 04-3024, 2005 WL 1080597, at*4 (D. Minn. May 6, 2005).

4.In order to defeat Dubow's claim under the Carmack Amendment, Western had the burden to prove at trial that damage to the Printer was caused solely by an act of the shipper.  *See Minneapolis, St. P. & S.S.M.R. Co. v. Metal-Matic, Inc.*, 323 F.2d 903, 905 (8th Cir. 1963).

5.The Court finds that Western did not meet its burden.  Whether or not the Printer was bolted to the floor of the trailer, the Court finds that damage to the Printer was not caused solely by an act of the shipper.  The Court specifically notes that the Printer was not the last freight loaded on the trailer, or the first unloaded.

6.      Damages under the Carmack Amendment include damages for delay, lost profits, and all reasonably foreseeable consequential damages. *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 931 (7th Cir. 2003).

7.      Dubow is entitled to recover the difference between the fair market value of the Printer at the time of the shipment from the value of the Printer at the time of delivery. The Court finds that the fair market value of the used Printer at the time of shipment was $150,000 and the value of the Printer at the time of delivery was $0.

8.      Dubow is also entitled to recover its loading, shipping, and inspection costs under Carmack. Dubow incurred $14,995.00 in loading feeds, $1,900 in shipping fees, and $3,880.21 in post damage inspection fees.

9.      The Court finds that Dubow is not entitled to recover the net profits it lost as a result of the damaged Printer because the losses were not reasonably foreseeable to Western. Western was not informed of the Printer's value, nor was it informed prior to its acceptance of the Printer's shipment that its acceptance included potential liability for Dubow's lost profits associated with any period of time that Dubow would not have an additional printer at its facility should the Printer be damaged and not useable.

10.     A carrier may limit its liability by establishing "rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written . . . declaration of the shipper or by written agreements between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 46 U.S.C. § 14706(c)(1)(A) (2020).

11. "To limit its liability under the Carmack Amendment, a carrier must: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to [the shipper's] choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to moving the shipment" (hereinafter "the *Hughes* test"). *MidAmerican Energy Co. v. Start Enterprises, Inc.*, 534 F. Supp. 2d 930, 934-35 (S.D. Iowa 2008) (citing *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987) and *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 186 (3d Cir. 2006).

Following the enactment of the Trucking Industry Regulatory Reform Act of 1994 and the ICC Termination Act of 1995, the first part of the *Hughes* test is no longer applicable. *Nipponkoa Ins. Co. v. Atlas Van Lines, Inc.*, 687 F.3d 780, 782 (7th Cir. 2012); see *Just Take Action, Inc.,* 2005 WL 1080597, at *6 ("[a]n actual tariff is no longer necessary to limit Carmack Amendment liability and has been abolished by the ICC") (citing Title 49 U.S.C. § 13710(a)(4); *Tempel Steel Corp. v. Landstar Inway, Inc.*, 211 F.3d 1029, 1030-31 (7th Cir. 2000).

12. The Court finds that Western satisfied all elements of the *Hughes* test. While Dubow did not directly agree to a liability limitation, at least one of its logistics companies did. A contract between a carrier and a logistics company can limit the carrier's liability to the cargo owner. *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 33 (2004) ("When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation

to which the intermediary and carrier agreed."); *see also Werner Enterprises, Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1323-26 (finding that cargo owner was bound by liability limitations negotiated between a second intermediary and a carrier). "The cargo owner retains the option to sue the intermediary who failed to protect itself by negotiating a liability limitation." *Id.* at 1325.

The record does not reflect that Western was ever informed of the Printer's value. Both Total Logistics and TCL knew that the carriers could offer different rates based on liability, that the rates were dictated by the value of the shipment, and that failure to indicate a value could limit the liability to a price per pound. (Trial Trans. Vol. II at 276-82, 314-15.) Here, Total Logistics never inquired of Dubow what the Printer's value was. While Total Logistics maintains that it was Dubow's duty to volunteer the Printer's value (*id.* at 277, 289), the Court disagrees. As a broker, Total Logistics had a duty to inform Dubow that there were different rates based on liability and that the Printer's value was necessary to insure a full liability rate. The Court finds that Total Logistics was negligent when it failed to inquire of Dubow what the Printer's value was and to share that information with TCL. The Court similarly finds that TCL was negligent when it failed to inquire of Total Logistics what the Printer's value was, in turn failing to ensure a full liability rate for the Printer.

TCL provided Western with only the Printer's weight and dimensions. Western quoted a rate based on its understanding that the Printer did not have a declared value. TCL had the opportunity to inquire about and declare the Printer's value to Western, either verbally or on the bill of lading, but did not do so. Based on the Accessory

13

Changes Document and numerous past dealings, TCL knew or should have known that failure to provide a value would limit Western's liability to the $1.50 per pound specified in the Accessory Changes Document.

While the Accessory Changes Document was not signed, the Court finds sufficient record evidence to conclude that each party had a clear understanding and agreement that the document constituted a written agreement whose terms were binding on their business dealings.  The Accessory Changes Document clearly specified that bill of ladings not indicating value would be valued by Western at $1.50 per pound of the order.

Therefore, by failing to declare a value, the Court finds that TCL knowingly accepted the limited liability rate.  There was no privity between Western and Dubow. "Carriers do not need to investigate upstream contracts."  *Werner*, 554 F.3d at 1325. Accordingly, the Court finds that Western cannot be held liable for the full damage to the Printer when both Total Logistics and TCL failed to disclose information that would have enabled Western to properly insure the shipment.  Dubow had the opportunity to sue, and did sue, both Total Logistics and TCL.  The fact that Dubow settled with those parties does not transfer all liability to Western.

13. The Court finds that a limitation of liability of $1.50 per pound accords with industry custom and practice and is therefore reasonable under the circumstances.

14. Western's liability is limited to $7,500.

## ORDER

Based upon not only the findings and conclusions of this Court, but also the entire record of this case, **IT IS HEREBY ORDERED** that monetary judgment be entered against Defendant Western Specialized Inc. and in favor Plaintiff Dubow Textiles in an amount equal to $7,500.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated:  November 24, 2021                           s/Donovan W. Frank
                                                    DONOVAN W. FRANK
                                                    United States District Judge